# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

SHEILA WHITE,                                    Case No. 1:14-cv-218

        Plaintiff,                          Dlott, J.
                                                 Bowman, M.J.
   v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Sheila White filed this Social Security appeal in order to challenge the Defendant's determination that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents a single claim of error. As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED because it is supported by substantial evidence in the administrative record.

### I. Summary of Administrative Record

Plaintiff filed an application for Supplemental Security Income ("SSI") in October 2010, alleging disability beginning on January 1, 2010, due to a combination of mental and physical impairments, including back pain, depression, lack of concentration, ADD, and "intellectual disfunction [sic]," described by Plaintiff as memory impairment. (Tr. 214, 225). After Plaintiff's application was denied initially and upon reconsideration, she requested a hearing *de novo* before an Administrative Law Judge ("ALJ").

At a hearing held in October 2012, ALJ Dwight D. Wilkerson heard testimony from Plaintiff and from a vocational expert. At the hearing, Plaintiff's counsel argued that Plaintiff met or equaled Listing 12.05C. (Tr. 48). On November 20, 2012, the ALJ

denied Plaintiff's application in a written decision, concluding that Plaintiff was not disabled. (Tr. 19-32). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the Defendant's final determination.

Plaintiff was born in 1972 and was 40 years old at the time of the ALJ's decision. She has a high school education, and has not engaged in any substantial gainful activity ("SGA") since her alleged disability date of January 1, 2010. However, she did participate in non-SGA work activity through sheltered work with Easter Seals Tri-State from April 2011 through the date of the hearing. (Tr. 199-200). Based upon the record and testimony, the ALJ found that Plaintiff has the severe impairments of: "degenerative disc disease, borderline intellectual functioning, and a depressive disorder." (Tr. 21). The ALJ additionally noted Plaintiff's obesity, attention deficit disorder, hypertension, and hyperlipidemia, but did not find any of those impairments to be "severe." (Tr. 22). None of Plaintiff's impairments, either alone, or in combination with any other impairments, met or medically equaled a listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 22). Instead, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work, except:

> [S]he is limited to simple and routine tasks and occasional, superficial interaction with others in a static and predictable work setting with no more than occasional changes.

(Tr. 25). The ALJ concluded that, while Plaintiff could not perform her past relevant work as an order taker, material handler, or hand packer, she could still perform "jobs that exist in significant numbers in the national economy," including, as testified to by the vocational expert, the jobs of inspector, folder/stacker, and machine tender. (Tr. 31). Accordingly, the ALJ determined that Plaintiff was not under disability, as defined in the Social Security Regulations, and not entitled to benefits. (Tr. 32).

On appeal to this Court, Plaintiff presents a single assertion of error: that the ALJ erred by failing to find that she met or equaled Listing 12.05C for mental retardation, and instead finding that she has "borderline intellectual functioning."

## II. Analysis

### A. Judicial Standard of Review

To be eligible for SSI benefits, a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference

from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy.  *See Combs v. Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §416.920.   However, a plaintiff bears the ultimate burden to prove by sufficient evidence that he or she is entitled to disability or supplemental security benefits.  *See* 20 C.F.R. § 404.1512(a).

**B.  Plaintiff's Assertion of Error Under Listing 12.05C**

The Listing for mild mental retardation,[1] contained in 20 C.F.R. Part 404, Subpart P, Appendix 1, states:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports an onset of the impairment before age

---

[1]As of January 1, 2015, the phrase "mental retardation" has been replaced with the phrase "intellectual disability." The regulation otherwise remains unchanged.  For consistency in this opinion, the undersigned uses the language in effect at the time of the Commissioner's last decision.

4

22.   The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

...C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

*Id.*   As reflected in the above language, Plaintiff was required to prove three things:  (1) a valid IQ score in the 60-70 range; (2) deficits in adaptive functioning; and (3) that both low IQ and deficits in adaptive functioning manifested themselves prior to age 22.  The ALJ found that Plaintiff did not meet any of the criteria.  Despite what appears to be error in the ALJ's assessment of Plaintiff's IQ score, the undersigned recommends affirming the ALJ's decision based upon substantial evidence in the totality of the record that Plaintiff does not meet the "adaptive functioning" requirements of Listing 12.05C.[2]

### 1.  Plaintiff's IQ Scores

The ALJ first found that Plaintiff did not have a valid IQ score within the requisite range, explaining:

While a few of her measured IQ scores have dipped slightly below 70, the vast majority of her scores remain above this level.  Despite the best arguments of the claimant's representative, her full-scale scores do not fall 'unambiguously' within the required range and demonstrate the onset of mental retardation prior to her 22nd birthday (see Exhibit 16B).

(Tr. 24).

The ALJ is correct that the "vast majority" of Plaintiff's IQ scores were above the required score cut-off of 70.  In fact, several of Plaintiff's scores were in the high-70's, at the upper end of the "borderline" range of intellectual functioning, and at least two "performance IQ" scores were well above 80, beyond even the "borderline" range.[3]  As

---

[2]Plaintiff asserts, and Defendant does not dispute, that if she were found to have a valid qualifying IQ score and the requisite deficits in adaptive functioning, she would meet or equal Listing 12.05C because she has at least one additional "severe" impairment.

the ALJ noted, nearly all of the psychologists who evaluated Plaintiff's intellectual functioning concluded that she functioned in the borderline range. (Tr. 25, 27).

Nevertheless, the ALJ's analysis reflects error, because only one measured IQ score at 70 or below is required to satisfy the numerical criterion.  There is no requirement that all scores fall "unambiguously" within the specified range, nor is there a requirement that a majority of a claimant's scores, much less the "vast majority," fall within the designated range.  In short, a single qualifying score is sufficient.  The fact that the qualifying score may equal 70, or be only "*slightly* below 70" does not invalidate Plaintiff's proof.  On the record presented, Plaintiff satisfied the Listing criterion because she had at least two scores within the requisite "mild mental retardation" range which were not determined by any medical source to be "invalid."  The qualifying scores occurred both before the age of 22, and during her recent adulthood.  (*See e.g.,* Tr. 172, WAIS-III verbal comprehension score of 70 at age 38; Tr. 263, Stanford Binet verbal IQ score of 68 at age 17).[4]

Defendant implicitly acknowledges the error, but contends that the ALJ's assessment of the IQ scores was "irrelevant" and "moot" because Plaintiff did not have the requisite deficits in adaptive functioning, such that she would meet or equal the Listing.  (Doc. 16 at 11).  Having closely reviewed the entirety of the record, the undersigned agrees that the error was harmless.

---

[3]See Tr. 263, reflecting performance IQ scores of 84 and 91, respectively, on the Wechsler IQ test when Plaintiff was age 14 and 11.

[4]Plaintiff appears to have a third qualifying score at age 11 years, but it is redundant to the extent that Plaintiff needed only one qualifying score prior to age 22. In addition, in their 1983 report, two school psychologists reported that Plaintiff's overall score of "79" on a Wechsler IQ test placed her at the "upper limits of the borderline range."  (Tr. 267-268).

### 2. Deficits in Adaptive Functioning

Notwithstanding the erroneous analysis of Plaintiff's qualifying IQ scores, the record as a whole provides substantial evidence to support the ALJ's conclusion that Plaintiff did not have sufficient deficits in adaptive functioning, and therefore could not otherwise meet or equal Listing 12.05C. In *Foster v. Halter*, 279 F.3d 348 (6th Cir. 2001), the Sixth Circuit clarified that IQ scores alone are insufficient; a claimant is required to satisfy the "adaptive functioning" standard to meet Listing 12.05C. *See also Hayes v. Com'r of Soc. Sec.*, 357 Fed. Appx. 672, 675 (6th Cir. 2009). In *Foster*, the plaintiff had dropped out of school after the ninth grade and had qualifying IQ scores at 42 years old, but did not satisfy Listing 12.05 because there was no evidence of deficits in adaptive functioning before age 22, and because her long-standing work record demonstrated an "ability to perform relatively complicated tasks" well into adulthood. *Id.* at 355. As in *Foster*, in this case the ALJ reasonably determined that Plaintiff did not show the requisite deficits of adaptive functioning either during her childhood or adulthood.

"Adaptive functioning" involves an individual's "effectiveness in areas such as social skills, communication, and daily living skills, and how well the person meets the standards of personal independence and social responsibility expected of his or her age by his or her cultural group." *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993), citing *Diagnostic and Statistical Manual of Mental Disorders*, pp. 28–29 (3d rev. ed.1987). To that extent, adaptive functioning differs from "academic" functioning. *West v. Com'r of Soc. Sec.*, 240 Fed. Appx. 692, 698 (6th Cir.2007)(citing *Heller*, and holding that plaintiff who held a long term, full-time job, with many activities of daily living, did not show deficiencies in adaptive functioning). "The American Psychiatric Association defines adaptive-skills limitations as '[c]oncurrent deficits or impairments ... in at least two of the

following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" *Hayes*, 357 Fed. Appx. at 677, citing DSM–IV–Tr at 45.

Whether a claimant meets or equals any portion of Listing 12.05 often relies upon what evidence supports - or conversely, undermines - a finding of deficits in adaptive functioning.  Many people with IQ scores lower than 70 remain capable of full-time work and therefore do not meet the Listing.  *See Thomas v. Com'r of Soc. Sec.*, 2010 WL 1254788 *8 (N.D. Ohio, March 24, 2010)(recognizing that "many individuals with mild mental retardation are still able to work").  As with the burden of proof for all listings, the claimant bears the burden of proving past and present deficits in adaptive functioning sufficient to satisfy Listing 12.05 at the administrative level.  At this judicial review stage, a plaintiff's burden is "much higher," to the extent that a plaintiff must show that the finding the ALJ made is not supported by substantial evidence.  *Carter v. Com'r of Soc. Sec.*, 2012 WL 1028105 at *6 (W.D. Mich., March 26, 2012).  On the record presented, Plaintiff fails to meet that burden.

### a.  Deficits in Adulthood/ Current Functioning

The ALJ's analysis of Plaintiff's adaptive functioning in adulthood is as follows:

[L]isting 12.05 requires an additional showing regarding the claimant's deficits in adaptive functioning.  Such a finding simply cannot be made upon a record that reveals the claimant's marriage and independent living by the age of 21, her role as a primary caregiver to her three children, her attainment of a driver's license, her abilities to read and handle money, and her long term successful employment in a number of prior jobs. Additionally, having observed and interacted with the claimant during the hearing, she does not present as mentally retarded.  The undersigned shares this belief with numerous psychological examiners.

(Tr. 24-25).  Underscoring the last sentence, the ALJ commented on the clinical impressions of several psychologists:

> In fact, examining professionals continue to find that "[s]he definitely does not present as mentally retarded," placing her instead at the "upper end of the borderline range".… Having directly observed and interacted with the claimant during the hearing, the undersigned concurs with those professional assessments.

(Tr. 27). In fact, three examining psychologists, Drs. Sexton, Berg, and Levy, opined that in adulthood Plaintiff functions in the borderline range. (*See e.g.* Tr. 385, Dr. Sexton opining that Plaintiff functions at the "upper end of borderline range"; Tr, 282, Dr. Berg opining that Plaintiff functions "in the borderline range of intelligence"; and Tr. 374, Dr. Levy.) Dr. Berg added emphasis with the following comment: "She definitely does not present as being mentally retarded even though it is noted that when she was 35 years old she obtained …[an] IQ score of 63 but was given [a] diagnosis at that time of borderline intellectual functioning." (Tr. 282, *see also* Tr. 284). Consistent with that analysis, Plaintiff herself reported she had been diagnosed with borderline intellectual functioning, a conclusion with which two non-examining consultants concurred. (Tr. 97, 110). In contrast to Plaintiff's current claim, the undersigned finds evidence of *any* "diagnosis" of mental retardation to be scant and inconclusive at best.

While Plaintiff cites to several instances of such a purported "diagnosis," close review finds that virtually all instances rely (incorrectly) in whole or in part on the psychological report of Don Hanon, identified as "School Psychologist" for Norwood Public Schools.[5] (*See generally* Exhibit 13E, at Tr. 263-266). Dr. Hanon completed his report as part of a routine evaluation for the continuation of "developmentally handicapped" services when Plaintiff was 17 years old and in the 10th grade. Contrary to later records that cite his report, nowhere does Dr. Hanon make any "diagnosis" of "mental retardation." Instead, a box has been checked that reflects that Plaintiff's

---

[5]Don Hanon's credentials are not specified, but the undersigned assumes that he completed a doctorate.

abilities fell within the broad IQ range of "50-79," indicating Dr. Hanon's opinion that she was ""Educable Mentally Handicapped" ("EMH") and therefore eligible for continued services. (Tr. 266).  However, the EMH label does not equate to Listing 12.05's "mild mental retardation" IQ range or diagnosis, because it includes the "borderline" IQ range of intellectual functioning.  Additionally, many people with IQs equal or below 70 still fall within the "borderline" range for purposes of Listing 12.05, due to a variety of factors including the evaluation of adaptive functioning.

In addition to her erroneous reliance on the Hanon report, Plaintiff cites to an October 2007 single page form completed by an unidentified representative of the Hamilton County Board of Developmental Disabilities, reflecting approval of Plaintiff's application for adult services.  The form reflects approval based on a purported "diagnosis" of "[m]ild mental retardation," but clearly attributes that "diagnosis" to the prior evaluation of "Don Hanon," which – as just discussed - *does not* contain any such diagnosis. (*See* Tr. 378).  The single-page form also includes a cursory and unexplained finding that Plaintiff has "substantial functional limitations" in the areas of "self care," "self direction," and "economic self sufficiency." (*Id.*).

Plaintiff also cites an alleged "diagnosis" by Dr. William Moore in November 2010. (See Tr. 379-380).  Apart from the ALJ's thorough and reasonable reasons for discounting Dr. Moore's report, Dr. Moore's "diagnosis" appears to be based exclusively on the "diagnosis" by the unidentified Hamilton County representative.  The Hamilton County agency, after approving Plaintiff's application for services, referred Plaintiff to Dr. Moore for evaluation of an alleged "recent memory disturbance," including with that referral its one-page form approving services based on Dr. Hanon's purported "diagnosis." (Tr. 378-379).

Plaintiff further claims that her "treating psychiatrist diagnosed Plaintiff with mild mental retardation." (Doc. 11 at 12). The signature of the "M.D." on the single page that Plaintiff cites is not entirely clear,[6] but the form contains only a cursory reference to "317" (a diagnostic code probably denoting mental retardation) in response to a query about the "most recent Axis II diagnosis(es) on file." (Tr. 356). Absent the identity of the physician, his/her relationship to Plaintiff, and basis for the alleged "diagnosis" (including who made it), the undersigned cannot accept this record as a "diagnosis" by a treating psychiatrist.

On the one hand, the listing does not *require* a formal diagnosis of mental retardation. On the other hand, courts within the Sixth Circuit have considered diagnostic evidence as one of several factors relevant to the determination of whether a claimant meets or equals Listing 12.05. *See, e.g., Cooper v. Com'r of Soc. Sec.*, 217 Fed. Appx. 450, 452 (6th Cir. 2007); *Daniels v. Com'r of Soc. Sec.*, 70 Fed. Appx. 868, 873-874, 2003 WL 21774004 (6th Cir. 2003)(claimant did not have required deficits where three psychologists agreed that Plaintiff was of low intelligence but not mentally retarded).

In addition to relying on various expert opinions as evidence of a lack of deficits in adaptive functioning, the ALJ explained:

> [S]uch factors as the claimant's ability to legally operate a vehicle, her marriage and facility to raise her children, her admitted aptitude with reading and handling money, and her lengthy past record of successful employment militate the finding that she has been, and remains, fully capable of competitive work activity. The fact that the claimant left many

---

[6]While only partially legible, the signature appears to be that of "W. Harrison," who was presumably employed with "GCB Psychiatric Services." The form indicates that the signatory saw Plaintiff for "supportive psychotherapy" services for 28 minutes on March 16, 2010. No information is provided as to the length of the physician's treatment relationship or how he/she came to note "317" as the most recent diagnosis.

of her former positions for reasons unrelated to her performance is particularly relevant to this conclusion, as are the "paragraph B" criteria discussed...above.

(Tr. 27-28).

The referenced "paragraph B" criteria included an evaluation of Plaintiff's activities of daily living and her abilities to maintain social functioning, and to maintain concentration, persistence, or pace.[7]  Importantly, Plaintiff does not challenge any of the ALJ's findings concerning the paragraph B criteria.  The ALJ found only mild limitations in Plaintiff's activities of daily living, noting that she performs "a full complement of tasks that include household chores, driving, caring for her children and cat, as well as shopping for groceries and personal items."  (Tr. 23)  The ALJ similarly found only mild limitations in social functioning, pointing out that she spends "time with her children and parents on a daily basis, and enjoys communicating with others through the internet...., watches television, writes letters, and bakes."  (*Id.*).  The ALJ noted that her "recent sheltered work at Easter Seals brought about reported increases in both her socialization and relationship-building skills."  (*Id.*). Last, the ALJ found moderate difficulties in concentration, persistence and pace, relying on Plaintiff's ability to follow simple written directives and handle money, despite her professed inability to use a cash register or to understand spoken instructions.  (*Id.*).

The undersigned finds substantial evidence to support the ALJ's determination that Plaintiff lacks the type of deficits of adaptive functioning required to satisfy Listing 12.05C.  In addition to the evidence cited by the ALJ, examples of Plaintiff's relatively high degree of literacy and communication skills can be found by review of the hearing transcript and her disability applications.  In those applications, Plaintiff reports that she

---

[7]A fourth "paragraph B" criterion, episodes of decompensation, is not relevant here.

drives, watches television, visits with her mother, writes to her (incarcerated) father, chats with others on the computer, bakes, prepares meals daily, feeds and grooms the cat, makes sure her two sons are dressed and fed, walks the younger child a mile to school and picks him up to walk him home each day, runs errands and does "stuff around the house." (*See, e.g.* Tr. 214-225). She also reported a hobby of model cars, and that she enjoys reading for pleasure since she has a lot of time to read. (Tr. 385, 374).

Before this Court, Plaintiff's counsel argues strenuously that the ALJ overstated Plaintiff's level of adaptive functioning. Plaintiff asserts that she functioned poorly as a parent since her children were once removed from her home by 241-KIDS and temporarily placed in foster care based on suspected neglect and possible abuse by her eldest son of the younger two children. (*See, e.g.*, Tr. 103, 228, 236; *see also* Tr. 543-544 (notation that oldest son abusing younger children and claimant). However, the undersigned cannot agree that the fact that Plaintiff briefly lost custody of her two younger children, due to abuse by her oldest son, unequivocally shows that Plaintiff had deficits in adaptive functioning. Regrettably, abuse by an older child or a boyfriend/spouse living in the same home can be attributed to many causes, most of which are presumed to bear little to no relationship to a parent's intellectual abilities. While Plaintiff's children were indeed temporarily removed, until that time, she raised her three children as a single parent who worked full-time during most of their formative years.[8] After the oldest child was removed, she succeeded in regaining custody of her younger two children. (*See, e.g.*, Tr. 434, May 2012 note that Plaintiff recently got one son back and is managing her work schedule and his school schedule well, without

---

[8]Plaintiff reported that she married at age 21, but was divorced within 2 or 3 years. (Tr. 279).

feeling overwhelmed). For similar reasons, the undersigned is unpersuaded that Plaintiff's eldest son's criminal history "strongly implies that Plaintiff's parenting skills are not as good as ALJ Wilkerson implies." (Doc. 11 at 9).   Her oldest child's criminal history is simply too far removed from the issue of whether Plaintiff has deficits in adaptive functioning to be relevant.

As additional proof of alleged deficits, Plaintiff's counsel states that Plaintiff was once evicted due to her failure to cooperate with an attempt to clean her apartment to eradicate a bedbug infestation. While there is a reference to Plaintiff not fully cooperating with the landlord's attempt to eradicate bedbugs (by canceling extermination appointments), Plaintiff reported to her case worker that the reasons for her eviction included police being called to the apartment on numerous occasions,[9] people staying there who were not on the lease, and not paying rent timely.  (Tr. 479-480; *see also* Tr. 485, 486, 492).  Plaintiff and her live-in boyfriend had consulted with a lawyer and planned to dispute the eviction in court.  (Tr. 480).  Therefore, the evidence of the one-time eviction does not overcome the substantial evidence that supports the ALJ's determination that Plaintiff has been able to maintain independent living since her marriage at the age of 21, and does not have sufficient deficits in adaptive functioning to satisfy Listing 12.05.

As additional evidence, counsel points out that case workers have repeatedly described her home as "messy" and/or "disorganized."  However, the undersigned finds the evidence to be decidedly mixed, with most records noting no such problems. For example, despite a large number of notes, on just one occasion did a caseworker note

---

[9]The 2011 eviction appears relatively close in time to when Plaintiff's oldest son was arrested and jailed on charges relating to the abuse of the younger children.  The record indicates that Plaintiff's 18-year-old son also was charged for being sexually active with her fiance's 13 year old daughter.  (Tr. 491, 493).

that dirty dishes were left on the stove and counters, and one other time noted "trash" was present on the living room coffee table.  (*See, e.g.*, Tr. 545, notation of "trash on the living room coffee table and crumbs on kitchen stove and surfaces"; *see also* Tr. 554, "Clt's apt was messy with dirty dishes on the stove and kitchen counters.")  Most of the cited records date between mid-December 2010 and January 2011, when a case worker repeatedly noted a "disorganized" living room due to the presence of "boxes in the middle of floor."  (*See* Tr. 551, 554, 562, all noting presence of boxes). Yet some of the same case notes reflect Plaintiff's continued "progress" in cleaning up the boxes. (*See, e.g.*, Tr. 562, "Clt. was able to throw away & donate 2 boxes of items.").  Earlier and later notes contain no similar statements regarding Plaintiff's housekeeping, suggesting that the period of disorganization was not a permanent condition.

In a related argument, Plaintiff's counsel cites to records that indicate Plaintiff's difficulties with maintaining personal hygiene.  Personal hygiene falls under activities of daily living.  The ALJ determined Plaintiff suffers from only "mild" impairment in that area, a finding that Plaintiff does not directly contest.  It is true that Plaintiff's hygiene has been described as disheveled or poor at times, (*see* Tr. 351, 359, 507, 516, 520, 523, 531), however, the undersigned does not agree that the records prove Listing level severity.  As with other alleged deficits, evidence concerning Plaintiff's personal hygiene is mixed, with some records describing Plaintiff's appearance as "neat and properly dressed," "neatly dressed," and "clean," and many records in which no concerns or "adequate" hygiene is noted. (*See e.g.,* Tr. 281, 345, 348, 354, 383).

Apart from the uncontested facts that Plaintiff has lived independently in apartments for years and raised three children single-handedly most of that time, the ALJ reasonably relied on Plaintiff's "past history of successful employment" as evidence that Plaintiff does not have sufficient deficits in adaptive functioning to meet the Listing.

15

Where a plaintiff exhibits a lengthy employment history, even unskilled work can be evidence of a lack of deficits in adaptive functioning. *See e.g., Justice v. Com'r of Soc. Sec.*, 515 Fed. Appx. 583, 587 (6th Cir. 2013)(noting evidence of "lengthy work history, including a variety of semiskilled and unskilled positions."). Here, Plaintiff's lengthy work history of nearly 15 years provides substantial evidence of a significant level of adaptive functioning. Plaintiff counters that her most recent employment was in a sheltered workshop position. However, the ALJ did not rely upon that particular non-SGA work[10] (which began more than a year after Plaintiff's alleged disability onset date) but instead upon Plaintiff's long-standing work history *prior* to her alleged disability onset date. (*See* Tr. 198-201). As the ALJ noted, there is no evidence that Plaintiff lacked the intellectual ability to work independently for years in a long series of positions, or that she left those positions for any cognitive reason. (*See* Tr. 281).

Plaintiff's social history - including one marriage/divorce, an engagement/live-in boyfriend, and regular contact with friends and family - also supports the ALJ's determination that Plaintiff does not have listing level deficits. Her social functioning has improved since she returned to work through the sheltered Easter Seals employment. (Tr. 28). And despite the referenced lapses in personal hygiene, there is no evidence that she has ever been dependent on others for basic personal needs like toileting, eating, dressing or bathing, or that she is unable to follow simple directions as determined by the ALJ.

Plaintiff points to evidence that she gets reminders to take her medications from a caseworker, who helps her fill her pill box. (*See* Tr. 220, 357, 444, 507, 528, 538).[11]

_____

[10]While the ALJ did reference the sheltered work, it was in the context of his discussion of Plaintiff's lack of social deficits and overall improvement in mental health since starting back to work full-time.

16

In addition, her case worker assisted her with grocery shopping, budgeting, and paying rent until her boyfriend/fiancé began to help her financially. (Tr. 221, 359, 496, 521, 524, 551).  Again, the referenced caseworker notes fail to overcome the substantial evidence that Plaintiff does not satisfy Listing 12.05C.  It is far from clear that the referenced issues reflect deficits in adaptive functioning caused by mental retardation, since budgeting and medication compliance issues are not unique to those with intellectual deficiencies but may have many causes, including ADHD, low wages or unemployment.  As but one example, the record reflects that theft by Plaintiff's oldest son contributed to her financial/budgeting problems. (Tr. 496).

Last, Plaintiff generally cites *Brown v. Sec'y of HHS*, 948 F.2d 268 (6th Cir. 1991) to support her argument that her activities of daily living are not necessarily "inconsistent" with mild mental retardation.  It is worth noting that *Brown* was decided prior to the emphasis on adaptive functioning highlighted in *Foster*.  More importantly, unlike the plaintiff in *Brown*, who only completed the sixth grade, this record contains substantial evidence to support the ALJ's determination that Plaintiff has "borderline intellectual functioning."  Ample post-*Brown* case law establishes that where a plaintiff has been able to live independently and maintain full-time employment for many years, an ALJ's decision that a plaintiff does not meet Listing 12.05 based upon her level of adaptive functioning generally will be upheld.  See *Bailey v. Com'r of Soc. Sec.*, Case No. 1:12-cv-140, 2013 WL 2286962 at *6 (May 23, 2013)(affirming ALJ where evidence existed that plaintiff had been able to live independently and maintain full-time employment for many years, collecting cases);  *West v. Com'r of Soc. Sec.*, 240 Fed.

---

[11]Several records, including Dr. Moore's report, relate Plaintiff's medication issues to short-term memory problems that occurred with "sudden onset" rather than longstanding deficits attributable to mental retardation. (*See* Tr. 379).

Appx. at 698; *Bryant v. Com'r*, Case No. 13-cv-584-MRB, 2014 WL 2761377 (S.D.

Ohio, July 23, 2014)(substantial evidence supported determination that plaintiff, who

lived with his mother, functioned in borderline range based on prior independent living,

lengthy employment history and relationship history); *Eversole v. Com'r*, Case No. 12-

cv-592-SSB, 2013 WL 294328 (S.D. Ohio, June 14, 2013), R&R adopted July 31,

2013)(substantial evidence supported ALJ determination that plaintiff functioned in

borderline range despite homelessness for period of years, based in part on long

employment and relationship history, including raising children).

### b. Deficits Manifested Before Age 22

The finding of a lack of deficits of adaptive functioning in Plaintiff's adult life is

sufficient to uphold the ALJ's determination that Plaintiff does not meet or equal Listing

12.05C.   However, the ALJ further determined that Plaintiff had failed to establish

sufficient deficits in childhood, prior to her 22nd birthday:

> While perhaps indicative of a borderline level of functioning, multiple intelligence tests administered during her formative years reveal full-scale scores ranging from a high of 79 in both 1983 and 1986 to a low of 68 in 1989.  Two other tests, administered in 1978 and 1979, yielded scores of 70 and 71, respectively....Vineland Adaptive Behavior testing throughout this period ranged from the upper end of the "low" range to the low end of the "moderately low" range....
>
> Despite her low intelligence scoring in 1989, a psychological report drafted that same year noted her employment at Wendy's and her high achievement in special education classes (Exhibit 13E/3).  At that time, the examiner concluded that "given [the claimant's] level of achievement, her appearance, her personality, and her industriousness, it would seem that the prognosis for her to eventually become a productive citizen is a favorable one." ... Such findings do not comport with a conclusion that the claimant experienced mental retardation during her childhood.

(Tr. 27).

> The claimant's educational records further indicate that she possesses strengths in common sense and practical reasoning…, conclusions plainly at odds with her assertion of a disabling mental condition.  A review of her high school transcript indicates a satisfactory cumulative grade point

average of 2.710, sufficient for graduation in the top quarter of her class….While she obtained these marks in a special education setting, they do not suggest her inability to function at a minimal level….

(Tr. 27-28).

The ALJ's analysis relies heavily upon the report of Dr. Hanon, which the undersigned agrees is at least consistent with – if not *more* consistent with – the ALJ's determination that Plaintiff fell within the borderline range of intellectual functioning than Plaintiff's counter-assertion that it supports a finding of mental retardation.   For example, Dr. Hanon remarks that Plaintiff currently "is one of the higher functioning students" in "word recognition, spelling, and math skills" and "would have the potential of being one of the better students in the Developmentally Handicapped classroom." (Tr. 264, 266).  He notes that Plaintiff is a "well-groomed young lady whose dress and use of make-up would suggest that she was interested in giving a good appearance," that she is "an affectionate girl and cares about others," has a pleasant "personality," is "cooperative," puts forth "good effort," and appears to have "come a long way" since she was first evaluated in first grade. (Tr. 264, 266).

Dr. Hanon also cites Plaintiff's "relative strengths in terms of vocabulary development and judgment/reasoning" as well as her strength in "'common sense'/practical reasoning." (Tr. 264, 266).  He explains "she would appear to be a better visual leaner than an auditory one, as was demonstrated by her inability to answer orally some very simple subtraction problems, …but …[ability] to work them with no difficulty … on paper." (*Id.*).  He finds her to be an "excellent speller [with]… good word attack skills."  (*Id.*).

Plaintiff's school records reflect that, despite being in learning disabled classes, she did not repeat any grades, and ultimately graduated high school with a GPA that

placed her in the top quartile of her high school class.[12]  (Tr. 262-273).  To counter that

record, Plaintiff points to two Vineland Adaptive Behavior Scales, on which she attained

a Composite Score of 66 at age 13 and a Composite Score of 71 at age 17.  (Tr. 263).

Yet school psychologists Johnson and Ward specifically opined that at age 11, Plaintiff

functioned at the "upper end of the borderline range," (Tr. 268), and Dr. Hanon had

access to all of Plaintiff's school records, including the referenced Vineland Adaptive

Behavior scores, when he filed his report. (*See also* Tr. 29, citing opinions of Drs.

Hanon, Johnson and Eppley).

In sum, viewing the record as a whole, the undersigned finds substantial

evidence to support the ALJ's determination that Plaintiff does not meet or equal Listing

12.05C.  Although some contrary evidence exists, this Court must affirm even if

evidence exists to support a different disability determination, so long as substantial

evidence can be found to support the conclusion reached by the ALJ.  Plaintiff argues

that the reviewing and examining psychologists who concluded that Plaintiff functioned

at the "borderline" level "could not say with certainty that Plaintiff did not have mild

mental retardation or that she did not meet the Listing" because they lacked her school

records.  (Doc. 17 at 3).  Plaintiff's argument is misguided.  It is Plaintiff's burden to

prove she meets the Listing, not the Commissioner's burden to prove she does not.  In

any event, Listing 12.05 requires proof of deficits in adaptive functioning in adulthood,

not only prior to age 22.  The referenced experts concluded that Plaintiff did not meet

that criteria.  Based on the definition of substantial evidence ("more than a scintilla but

less than a preponderance"), the undersigned recommends affirming the ALJ's

decision.  *See generally Rogers v. Com'r,* 386 F.3d 234, 241 (6th Cir. 2007)(defining

---

[12] *See* Tr. 272, listing Plaintiff's rank in her graduating class as 45th out of 180 students.

substantial evidence, additional citation omitted); *see also Bailey v. Com'r of Soc. Sec.*, *supra* (holding that ALJ properly evaluated conflicting evidence concerning Plaintiff's IQ scores, with several scores supporting a finding of borderline intellectual functioning despite additional scores below 70, including one score of 59).

### III. Conclusion and Recommendation

Accordingly, **IT IS RECOMMENDED THAT** the decision of the Commissioner to deny Plaintiff SSI benefits be **AFFIRMED** because it is supported by substantial evidence in the record as a whole.

 */s Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

SHEILA WHITE,                                                    Case No. 1:14-cv-218

        Plaintiff,                                              Dlott, J.
                                                                 Bowman, M.J.

    v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.


## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).